**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRITTANY MOBELY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1288 |
| | ) | |
| MERAKEY ALLEGHENY VALLEY SCHOOL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this lawsuit, Plaintiff Brittany Mobley ("Mobley")[1] alleges that her former employer, Defendant Merakey Allegheny Valley School ("Merakey"), discriminated against her because of her race, and terminated her employment in retaliation for complaining about the disparate treatment that she allegedly faced, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act, 43 Pa. C.S. § 951 *et seq.* (Docket No. 1). Presently before the Court is the Motion for Summary Judgment and brief in support (Docket Nos. 46, 47) filed by Merakey, Mobley's brief in opposition thereto (Docket No. 56), and Merakey's reply (Docket No. 57). In addition to the motion and briefs, the Court has considered the concise statements of material facts and responses thereto, as well as the appendices filed in conjunction with the briefs. (Docket Nos. 48, 49, 54, 55). On July 26, 2023, the Court held oral argument on Merakey's motion. (Docket Nos. 59, 60).

For the reasons set forth herein, Merakey's motion is granted.

---

[1] Although Plaintiff's name is spelled "Mobely" on the docket and in the caption of the Complaint, it is spelled "Mobley" in the body of the Complaint and in the Civil Cover Sheet (Docket Nos. 1, 1-1), and it is spelled both ways in the filings in this case. For the sake of uniformity, The Court will use "Mobley" herein, which is the spelling used by both parties in their briefs in support of, and in opposition to, Merakey's summary judgment motion.

## I.  **FACTUAL BACKGROUND**[2]

Since the parties are well-acquainted with the factual background of this case, the Court will present here an abbreviated version of the facts relevant to the parties' motions.  Mobley was hired in July 2016 as a House Manager Aide ("HMA") by Merakey, which is a non-profit organization that provides homes and a full range of services to individuals (typically referred to as "Consumers") who have various levels of intellectual and developmental disabilities.  (Docket Nos. 48, ¶ 7; 54, ¶ 7).  All employees at Merakey are held to general standards of conduct, and its handbook provides, with regard to "Quality of Care," that "[t]o ensure a safe environment, Merakey prohibits abuse, mistreatment or neglect of a Consumer."  (Docket Nos. 48, ¶ 3; 54, ¶ 3).  Further, according to Merakey's Standards of Professional Behavior Policy, "Founded instances of violations of the Standards of Professional Behavior or any Merakey policies may lead to disciplinary action up to and including termination."  (Docket Nos. 48, ¶ 4; 54, ¶ 4).  As a Merakey employee, Mobley signed written acknowledgements, confirming that she had received a copy of Merakey's Handbook and Policies and Procedures, including the Standards of Professional Behavior Policy, and she testified that she had seen other individuals be disciplined for violating the Standards of Professional Behavior Policy.  (Docket Nos. 48, ¶¶ 5, 6; 54, ¶¶ 5, 6).

On or about March 24, 2017, Mobley transitioned from her previous position into the Live-In House Manager ("HM") position at the Windy Ghoul Single Family Residence ("SFR" or "Home") location.     (Docket Nos. 48, ¶ 8; 54, ¶ 8).  Following her interview with Stacey Speer ("Speer"), an Administrator for Merakey, Mobley was offered the position.  (Docket Nos.

---

[2]      The relevant facts are derived from the undisputed evidence of record, and the disputed evidence of record is read in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

48, ¶¶ 9, 10; 54, ¶¶ 9, 10).   As Live-In HM, Mobley lived in the Home with six (6) residents/Consumers, and reported directly to Speer.   (Docket Nos. 48, ¶¶ 11, 12; 54, ¶¶ 11, 12).

As Live-In HM, Mobley was responsible for the complete operation of the Windy Ghoul SFR, including, but not limited to, overseeing staff and ensuring that Consumers were properly cared for by staff.  (Docket Nos. 48, ¶ 18; 54, ¶ 18).  Aside from Speer, who made visits to the Home, Mobley had the highest level of authority of the Merakey employees assigned to work at the Windy Ghoul SFR.  (Docket Nos. 48, ¶ 19; 54, ¶ 19).  As part of the daily routine, Mobley was responsible for ensuring that the Windy Ghoul Consumers were loaded onto a bus so that they could be transported to one of two programming centers ("Day Programming").  (Docket Nos. 48, ¶ 21; 54, ¶ 21).  The Windy Ghoul Consumers were scheduled to arrive at Day Programing in the mornings, and they were scheduled to return to the Windy Ghoul SFR between 3:15 and 3:30 p.m. on most days.  (Docket Nos. 48, ¶¶ 23-25; 54, ¶¶ 23-25).

While Mobley worked as Live-In HM, she was responsible for the care of six Consumers who resided in the Windy Ghoul SFR, most of whom were wheelchair bound (i.e., non-ambulatory).  (Docket Nos. 48, ¶¶ 26, 27; 54, ¶¶ 26, 27).  Each Consumer has an individualized care plan, or "Profile," that outlines their level of care and supervision needs.  (Docket Nos. 48, ¶ 29; 54, ¶ 29).  One Consumer, "Ed," has a Profile section addressing mobility that states that he self-propels indoors and specifies that, to ensure his safety, Ed must remain within eyesight of staff while in his wheelchair. (Docket Nos. 48, ¶ 30; 54, ¶ 30).  Mobley was well acquainted with Ed's care and supervision needs, including the need to ensure that Ed remains within eyesight of staff while in his wheelchair.  (Docket Nos. 48, ¶ 31; 54, ¶ 31).

On or about January 1, 2019, Ed fell to his side while in his wheelchair.  (Docket Nos. 48, ¶ 32; 54, ¶ 32).  On February 7, 2019, Mobley received a Performance Management Note,

which, among other things, stressed the importance of assisting with loading/unloading Consumers from the bus each morning and afternoon so that Mobley could ensure proper care for the Consumers. (Docket Nos. 48, ¶ 34; 54, ¶ 34). That Note specifically highlighted the importance of ensuring the proper tie down of Ed's wheelchair in the bus, and further restated the importance of providing Ed with appropriate supervision while he is in his wheelchair. (Docket Nos. 48, ¶ 35; 54, ¶ 35). On March 22, 2019, Mobley received a Corrective Action Form, related to the expectation that she was expected to assist with loading/unloading Consumers on the bus at the beginning and end of the day when the Consumers return from Day Programming so that Mobley "can observe the staff to ensure staff are properly securing w/c's, removing tie downs from the bus floor, etc." (Docket Nos. 48, ¶ 36; 54, ¶ 36).

On the same day that Mobley received the form, she spoke to Merakey's Human Resources regarding her supervisor, Speer, and complained of instances of allegedly unfair treatment and racially insensitive remarks. (Docket Nos. 48, ¶¶ 37-39; 54, ¶¶ 37-39). Mobley's complaint was assigned to an independent investigator, Thad T. Stultz ("Stultz"), an Employee Relations Specialist employed by Merakey in its Adult Behavioral Division. (Docket Nos. 48, ¶ 40; 54, ¶ 40). At the conclusion of the investigation, Stultz issued an HR Investigation Report that found all but two of Mobley's allegations to be unfounded. (Docket Nos. 48, ¶ 42; 54, ¶ 42). However, in his Report, Stultz concluded there was a "strained relationship" between Mobley and Speer, and recommended, among other things, professionalism training for Speer. (Docket Nos. 48, ¶ 45; 54, ¶ 45). Following the investigation by Stultz, Speer received retraining and corrective action. (Docket Nos. 48, ¶ 46; 54, ¶ 46).

On April 11, 2019, Speer made an unannounced visit at the Windy Ghoul SFR, at which time Mobley and three other House Manager Aids ("HMAs"), Chelsea Wooley ("Wooley"),

Kaitlyn Douds ("Douds"), and Ravon Cousar ("Cousar"), were present at the Home.  (Docket Nos. 48, ¶¶ 47-48; 54, ¶¶ 47-48).  When Speer arrived, she found Mobley, Cousar and Douds smoking outside the Home. (Docket Nos. 48, ¶ 51; 54, ¶ 51).  Because of the time of day, Speer asked why the Consumers were still at the Windy Ghoul SFR and not being transported to their Day Programming. (Docket Nos. 48, ¶ 52; 54, ¶ 52).  Speer then entered the Home and found Ed sitting in his wheelchair alone in the back office, despite the fact that Ed's level of care requires continuous supervision when in his wheelchair.  (Docket Nos. 48, ¶ 53; 54, ¶ 53).  Speer asked why Ed was left alone in the office, and Mobley told Speer that she was not aware that Ed was alone in the office.  (Docket Nos. 48, ¶¶ 54-55; 54, ¶¶ 54-55).  After leaving the Windy Ghoul SFR, Speer promptly notified her direct supervisor, Regional Executive Director Gary Hoffman ("Hoffman"), and Merakey's Human Resources that, when she arrived at the Home on April 11, 2019, she found Mobley outside smoking with two HMAs, while a fill-in staff member was inside the Home, leaving Ed unattended in his wheelchair.  (Docket Nos. 48, ¶ 57; 54, ¶ 57).  Speer also noted that the Windy Ghoul SFR staff was behind schedule in getting the Consumers loaded onto their bus and transported to Day Programming that morning.  (*Id.*).

Merakey's Human Resources assigned Speer's report of neglect to an independent investigator, Susan Cassidy ("Cassidy"), a Merakey employee who is certified through the Pennsylvania Office of Developmental Programs to investigate instances of possible neglect and/or abuse of individuals with intellectual and developmental disabilities.  (Docket Nos. 48, ¶¶ 58-59; 54, ¶¶ 58-59).  As part of the investigation, Cassidy interviewed a number of witnesses, including Mobley, the three HMAs present at the Windy Ghoul SFR on April 11, 2019, and Speer.  (Docket Nos. 48, ¶ 60; 54, ¶ 60).  When questioned, Mobley told Cassidy that, at the time Speer arrived at the Home and found her on the porch with two other HMAs, Mobley

did not know where Ed was situated in the Home, she did not know where Wooley was located in the Home, and she did not know how Ed got to the back office or how long he had been there before he was found.  (Docket Nos. 48, ¶¶ 61-63; 54, ¶¶ 61-63).  Mobley also admitted that she had asked Cousar if she wanted to go outside and smoke, and Mobley confirmed that Douds followed them out onto the porch, leaving Wooley in the Home with the six Consumers. (Docket Nos. 48, ¶ 64; 54, ¶ 64).  Mobley further admitted to Cassidy that she did not give any of the HMAs specific instruction to watch Ed before she stepped outside to smoke. (Docket Nos. 48, ¶ 65; 54, ¶ 65).

As the HM for the Windy Ghoul SFR, Mobley was responsible for ensuring that all of the HMAs, including fill-in staff, received the necessary training and instruction regarding Ed's supervision needs, and she was required to do paperwork as to such training.  (Docket Nos. 48, ¶ 67; 54, ¶ 67; 60 at 16-17).  As part of her investigation, Cassidy said that she searched the Windy Ghoul SFR extensively in an effort to locate Staff Acknowledgment ("SA") sheets showing that the HMAs had been trained on Ed's supervision needs. (Docket Nos. 48, ¶ 66; 54, ¶ 66).  Cassidy found an SA sheet confirming that one of the three HMAs (Cousar) had been trained on Ed's supervision needs, but she said that she could not find SA sheets for the other two HMAs (Douds and Wooley) who were present at the Home on April 11, 2019.  (Docket Nos. 48, ¶ 68; 54, ¶ 68).  When Cassidy followed up with Wooley and Douds, they indicated that they had not been trained on, nor were they aware of, Ed's supervision needs.  (Docket Nos. 48, ¶ 69; 54, ¶ 69).

On April 15, 2019, Cassidy completed a Certified Investigation Report detailing her investigation findings.   (Docket Nos. 48, ¶ 70; 54, ¶ 70).   On April 16, 2019, Cassidy

summarized her findings in an email addressed to Human Resources, Hoffman, and Assistant

Regional Executive Director Roni Erath ("Erath"), including the following:

> - Brittany [Mobley] said that she arrived upstairs in the home at 7:15 am and had a lengthy conversation with the staff about arrival times at the program[m]ing centers.  At this point, the bus should have been on the way to program[m]ing in order to arrive at 8:15 which is the designated arrival.  Two of the staff said that they heard Brittany state that she did not care what time they arrived at program.
> - Brittany then asked Ravon [Cousar] to come outside and smoke with her. Kaitlyn [Douds] followed them outside a few minutes later.  Brittany admitted that she did not question if someone was watching [Ed] while she was outside with two of the three staff.
> - Only one of the other targets, Ravon Cousar, signed the SA sheet acknowledging that she was told of [Ed's] level of supervision.  Kaitlyn said she was never told and Chelsea [Wooley] was a fill-in who stated that she never saw Brittany at the house before this day and received no direction from Brittany.
> - Stacey arrived at the house at 8:20 am and Brittany, Ravon, and Kaitlyn were outside smoking.  The designated arrival time at Zapp [Day Programming] is 8:15 am.  The actual arrival time on 4/11/19 was 9:25 am for Zapp and 9:45 for KPC [Day Programming].

(Docket Nos. 48, ¶ 71; 54, ¶ 71).

After receiving the Certified Investigation Report from Cassidy, Erath filled out the last

section of the report titled "Administrative Review, Findings, Recommendations, and

Implementation," noting that the evidence supported a determination of abuse/neglect based on

the fact that Ed was not being provided the proper level of supervision.  (Docket Nos. 48, ¶¶ 72-

73; 54, ¶¶ 72-73).  Erath recommended a final corrective action and two-day suspension for the

HMA (Cousar) who had been trained on Ed's level of supervision, and training/re-training for all

staff regarding Ed's level of supervision.  (Docket Nos. 48, ¶ 74; 54, ¶ 74).  Based on Mobley, as

an HM, having a higher level of responsibility, and given that Mobley was well aware of Ed's

supervision needs, Erath recommended that Mobley's employment be terminated.  (Docket Nos.

48, ¶ 75; 54, ¶ 75).  The final decision to discharge Mobley was made by a committee of

Merakey senior management consisting of Erath, HR Employee Relations Specialist Vera Ansani, and Regional HR Manager Brandi Kruse (collectively, "senior management"). (Docket Nos. 48, ¶ 76; 54, ¶ 76).

While the investigation was underway, Mobley contacted Erath seeking information as to whether she would receive discipline as a result of the investigation. (Docket Nos. 48, ¶ 77; 54, ¶ 77). On or about April 19, 2019, Erath and a Merakey Employee Relations Specialist returned Mobley's call and informed her that her employment was being terminated as a result of the investigation. (Docket Nos. 48, ¶ 78; 54, ¶ 78). Erath also advised that through the investigation it was determined that Mobley was outside the group home smoking with two subordinate staff when the entire group home (both residents and staff) should have been at Day Programming, and that neither Mobley nor her subordinate staff were providing or ensuring the proper level of care to the residents at the time. (Docket Nos. 48, ¶ 79; 54, ¶ 79). On or about April 19, 2019, Erath also mailed Mobley a letter confirming her discharge, and advising that her employment was terminated for violation of Merakey's Standards of Professional Behavior, #10, Quality of Care. (Docket Nos. 48, ¶ 80; 54, ¶ 80).

Thereafter, Plaintiff dually filed a timely Charge of Discrimination and Retaliation against Merakey with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (Docket Nos. 1, ¶¶ 8, 9; 11, ¶¶ 8, 9). On June 2, 2020, the EEOC issued Mobley a right to sue letter. (Docket Nos. 1, ¶ 10; 11, ¶ 10). Mobley timely filed her Complaint in this matter on August 31, 2020 (Docket No. 1), and Merakey filed its Answer and Counterclaim on January 14, 2021 (Docket No. 11). On February 4, 2021, Plaintiff filed a Motion to Dismiss Counterclaim. (Docket No. 14). Mobley's motion

was granted on May 26, 2021, and Merakey's Counterclaim was dismissed without prejudice to its right to file the claim in state court. (Docket Nos. 23, 24).

Mobley's Complaint contains two claims, based on the same allegations: (I) Violation of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e *et. seq.*, Based on Racial Discrimination and Retaliation; and (II) Violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S. § 951 *et seq*. (Docket No. 1 at 6-7). Merakey filed its Motion for Summary Judgment, the motion has been fully briefed by the parties, oral argument has been held, and the motion is now ripe for decision.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). A disputed fact is material if it might affect the outcome under the substantive law. *See Boyle v. Cnty. of Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247-48). Summary judgment is unwarranted where there is a genuine dispute about a material fact, that is, one where a reasonable jury, based on the

evidence presented, could return a verdict for the non-moving party with regard to that issue. *See Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party without weighing the evidence or questioning the witnesses' credibility. *See Boyle*, 139 F.3d at 393. The movant has the burden of demonstrating the absence of a genuine issue of material fact, while the non-movant must establish the existence of each element for which it bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant has pointed to sufficient evidence of record to demonstrate that no genuine issues of fact remain, the burden is on the non-movant to search the record and detail the material controverting the movant's position. *See Schulz v. Celotex Corp.*, 942 F.2d 204, 210 (3d Cir. 1991). Rule 56 requires the non-moving party to go beyond the pleadings and show, through the evidence of record, that there is a genuine issue for trial. *See Celotex v. Catrett*, 477 U.S. at 324.

### III.  LEGAL ANALYSIS

The first claim in Mobley's Complaint alleges race discrimination and retaliation in violation of Title VII, and the second claim alleges race discrimination and retaliation in violation of the PHRA. The Court need not differentiate between Mobley's claims under Title VII and the PHRA, however, because the same analysis is used for both claims, so both claims will be addressed together as one claim herein. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000)). Additionally, during oral argument on Merakey's motion, counsel for Mobley conceded the Title VII/PHRA claim to the extent it alleges discrimination based on racial animus, and counsel indicated that only the retaliation claim was being advanced. (Docket

No. 60 at 29).  Accordingly, at this juncture, the Court will consider whether Merakey is entitled to summary judgment as to Mobley's retaliation claim.

### A.    Retaliation Under Title VII

Title VII provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

To maintain a claim of retaliation under Title VII, a plaintiff must show that:  "(1) she engaged in [protected activity]; (2) [her] employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995). "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (citing *Slagle v. Cnty. of Clarion,* 435 F.3d 262, 266 (3d Cir. 2006)).  As to the second element, "adverse actions," a plaintiff "must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Moore*, 461 F.3d at 341 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)).  As to the third element, a plaintiff can establish a causal connection between protected activity and an adverse employment action by showing that the temporal proximity between the two is unduly

suggestive, or by showing that there is other evidence of retaliatory animus in the record as a whole, such as inconsistencies in the defendant's proffered reasons for the adverse action or an ongoing pattern of antagonism.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2001).

If a plaintiff establishes a *prima facie* case of retaliation, then the familiar *McDonnell Douglas* approach applies, in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997), describing the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) ("[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").  Further, at the pretext stage, "the factual inquiry into the alleged discriminatory motives of the employer [rises] to a new level of specificity."  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998).  Thus, "[t]he plaintiff must not only establish that the employer's reason was wrong, but that it was so plainly wrong that it could not have been the real reason."  *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 316 (W.D. Pa. 2020) (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).  Notably, "'[f]ederal courts are not arbitral boards ruling on the strength of "cause" for discharge.  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination/retaliation].'"  *Id.* (quoting *Keller*, 130 F.3d at 1109 (additional internal quotation marks and citation omitted)).

Here, the parties do not dispute that Mobley has established the first two elements of a *prima facie* case of retaliation by showing that, first, she engaged in protected activity when she complained to Human Resources that Speer made racially insensitive remarks and treated her unfairly, and second, Merakey took an adverse action against her when it terminated her employment.  (Docket No. 60 at 13-14).  The parties disagree, however, as to whether Mobley has shown the third element, a causal connection between her complaint and her discharge. Mobley asserts that she has shown a causal connection based on the proximity in time between the two events and because Merakey's proffered reason for her termination was pretext for a retaliatory animus.  (Docket No. 56 at 10).  Merakey disagrees, arguing that Mobley has not made a *prima facie* case because she has not shown evidence from which a reasonable jury could find a causal connection between the two events.  Merakey further asserts that, even if Merakey has made a *prima facie* case, her employment was terminated for legitimate non-discriminatory reasons.  In response, Mobley contends that she has shown evidence from which a reasonable jury could conclude that Merakey's proffered legitimate business reason for her termination – that she jeopardized the safety of a resident – is pretext for retaliatory animus.  (*Id.* at 10-11).

## B.    Cat's Paw Liability

As explained, *supra*, in moving for summary judgment, Merakey argues that Mobley has failed to establish a *prima facie* case of retaliation because she has not shown the required third element, a causal connection between her complaint to Human Resources about Speer and her discharge.   Merakey notes that Mobley does not allege (nor does she present evidence suggesting) that Merakey's senior management condoned Speer's racially insensitive remarks or unfair treatment of Mobley, and that the evidence shows that Merakey took Mobley's complaints about Speer seriously since those complaints were investigated and Speer was retrained.  Rather,

Mobley contends, in part, that Merakey should be held liable for Speer's alleged retaliatory conduct because, even though Speer did not make the decision to discharge Mobley, Speer's conduct set in motion a chain of events that led to senior management's decision to terminate Mobley's employment.

In so arguing, Plaintiff is invoking the "cat's paw" theory of liability.  Under that theory, an employer may be held liable if a supervisor with alleged retaliatory animus *influenced or participated in* a decision to take an adverse employment action against an employee, and if such animus was the *proximate cause* of the employment action at issue.  *See McKenna v. City of Phila.*, 649 F.3d 171, 180 (3d Cir. 2011) (affirming the district court's judgment in a cat's paw case in which the employer relied on accusations of an allegedly biased supervisor, and there was no evidence to support a conclusion that a hearing was an intervening superseding cause of the employee's termination); *see also Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (finding that a reasonable jury could not find retaliation on a cat's paw theory of liability because the employer had conducted its own investigation and had not simply relied on the allegedly biased supervisor's input).  Thus, to prevail using the cat's paw theory, a plaintiff must establish that the non-decisionmaker's actions *proximately caused* the adverse employment action, which "requires 'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect.'"  *Jones*, 796 F.3d at 330 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)).

Merakey argues that, based on the proffered evidence, no reasonable jury could find that Speer proximately caused Mobley's discharge since Merakey's decision to terminate Mobley's employment was based on an independent investigation that included Mobley's own admissions and corroborating testimony from multiple witnesses.  Specifically, the investigation verified that

Ed did not receive appropriate supervision and/or care, and further confirmed that Mobley blatantly ignored her obligations in this regard.   (Docket Nos. 48, ¶¶ 70-73; 54, ¶¶ 70-73). Merakey asserts that this case is thus similar to the situation presented in *Jones v. Southeastern Pa. Transportation Authority*, 796 F.3d at 323.   In *Jones*, the Third Circuit Court of Appeals affirmed the district court's finding that, even if the supervisor's conduct was based on animus, and even if the supervisor's conduct was a but-for cause of the employee's termination, the employee did not show proximate cause when the employer did not simply rely on the supervisor's assertions in making the employment decision at issue.   *See* 796 F.3d at 330-31. The Third Circuit noted in *Jones* that, although the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411, 420-21 (2011), declined to adopt a "hard-and-fast rule" that an employer's intervening exercise of independent judgment *precludes* a finding of proximate cause, the Supreme Court indicated that proximate cause does not exist when the employer does not *rely on* the "supervisor's biased report" in taking the ultimate adverse action.   *See* 796 F.3d at 330-31 (quoting *Staub* and noting that the Supreme Court also indicated therein that it "'is necessary in any case of cat's paw liability' that 'the independent investigation rel[y] on facts provided by the biased supervisor'").   Merakey argues that here, like in *Jones*, the Court should find that there is no showing that Speer's alleged animus was the proximate cause of Mobley's discharge, because the authorities conducting the investigation did not merely adopt Speer's accusations or rubber-stamp her recommendations.   *See Jones*, 796 F.3d at 331.   Instead, Merakey argues that, as in *Jones*, the investigation in this case was conducted independently, and the decision to discharge Mobley was based on an investigation separate from Speer's accusations.   *See id.*   Thus, as in *Jones*, Merakey asserts that there is "no evidence that [Speer] influenced the . . . investigation or [Merakey's] termination decision beyond getting the ball rolling with [her] initial report."   *Id.*

(noting that *Jones* was "a far cry from *McKenna*, where there was no evidence that the employer relied on anything besides the allegedly biased supervisor's say-so in deciding to terminate the employee" (citing *McKenna*, 649 F.3d at 179)).

In response, Mobley contends that she has shown that Speer *did have* involvement in, or influence over, the decision to discharge Mobley, and that such involvement/influence is sufficient to show that Speer's actions proximately caused Mobley's discharge. Specifically, Mobley argues that Speer knew that Wooley (the HMA who remained in the Home while Mobley and the other HMAs were outside smoking) had been trained regarding Ed's care,[3] and Speer knew that this fact impacted the investigation, but she did not relay that information to anyone else involved in the investigation. In support of this argument, Mobley proffers an email from Brandi Kruse to Gary Hoffman (which was also sent to Ansani, Erath, and Speer), stating, in relevant part, as follows:

> Hi Gary,
> A piece of the investigation hinges on interviewing the HM to determine if the employees were trained or not. We cannot currently locate documentation that demonstrates they were trained; however, if in fact they were trained and the HM has the documentation, it significantly changes the outcome of the investigation.

(Docket No. 56-1 at 2). Mobley asserts that Kruse's email shows that Speer knew (from being copied on the email) that the employees' training information was important to some part of the investigation, but the record is devoid of evidence showing that Speer told anyone involved that Wooley had been trained regarding Ed's care, and that "[t]his fact alone is sufficient to defeat summary judgment." (Docket No. 56 at 7). More specifically, as Mobley's counsel summarized during oral argument, Speer knew the training was important to the investigation but did not tell

---

[3]     Attached to Mobley's opposition brief is a copy of the sign-in sheet (showing Wooley's name) from a monthly meeting held on March 1, 2019, at which, according to deposition testimony, Speer was also present and Ed's care was discussed. (Docket No. 56-2 at 2).

anyone that Wooley had been trained, and Speer failed to share this information in order to get Mobley fired.  (Docket No. 60 at 15-16).

In so arguing, however, Mobley relies on the assumption that she was discharged because the investigator and senior management were unaware of Wooley's prior training.  Mobley further implies, in making this argument, that if the investigator and senior management had known of Wooley's training, the result of the investigation would have been different in that senior management would not have discharged Mobley.  Noting that the Court must draw all inferences in a light most favorable to the non-moving party on summary judgment, Mobley asks the Court to conclude that, based on Kruse's email, a reasonable jury could infer that Speer's failure to reveal information regarding Wooley's training interfered with the investigation, and that such interference was the proximate cause of Mobley's discharge.

Upon review of Kruse's email, however, the Court finds that it is unable to draw the inferences that Mobley requests.  First, the "piece of the investigation" that, Kruse says, hinges upon the HMAs' training is not identified, so it is unclear *what* piece of the investigation Kruse is referring to in her statement.  (Docket No. 56-1 at 2).  Additionally, Kruse does not explain in the email *how* the HMAs' training information would change the outcome of the investigation in relation to her (although the Court notes that the investigation ultimately resulted in the three HMAs being disciplined differently, depending on whether each of them had been trained or not), and Kruse makes no reference in the email to Mobley's discipline.  Moreover, Mobley admittedly made no attempt during discovery to better understand the meaning of Kruse's comments.  In fact, during oral argument, the Court specifically questioned Mobley's counsel on this issue:

> The Court:        Questions for you about that, too.  The first is the e-mail
>                   starts off:  A piece of the investigation hinges upon.  Did you

> have occasion to depose or otherwise inquire of Ms. [Kruse] what she meant by a piece of the investigation?  Which piece was she referring to?

Mr. Newborg:    She was not deposed, Your Honor, so the answer is no.

(Docket No. 60 at 16).

Since the meaning of Kruse's email about the HMAs' training is unclear, since Mobley has shown no evidence of a connection between the HMAs' training and her discharge, and since Mobley made no inquiries regarding Kruse's email during discovery, the Court finds that any conclusion as to the meaning of the statements in Kruse's email would be purely speculative. *See Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536 & n.3 (3d Cir. 1994) (explaining that on summary judgment, the nonmovant must respond to the movant by pointing to sufficient cognizable evidence to create material issues of fact concerning every element to which it will bear the burden of proof at trial).  The Court is therefore unable to infer, from Kruse's email alone, that:  if Speer had disclosed the training information, then senior management would not have discharged her; and thus, that a reasonable jury could find, based on Kruse's email, that Speer's failure to inform others of Wooley's training interfered with the investigation and influenced the decision regarding the adverse action taken against Mobley, such that Speer's conduct was the proximate cause of Mobley's discharge.

As the Third Circuit explained in *Jones*, "proximate cause will not exist when the employer does not rely on the 'supervisor's biased report' in taking the ultimate adverse action. 796 F.3d at 331.  This case, like *Jones*, "is a far cry from *McKenna*, where there was no evidence that the employer relied on anything besides the allegedly biased supervisor's say-so in deciding to terminate" the plaintiff's employment.  *Id.*  Here, the only evidence that Mobley offers to show that Speer influenced Merakey's investigation (beyond getting the ball rolling by reporting

the April 11, 2019 incident) is Speer's failure to tell the senior management that Wooley had been trained as to Ed's care. However, Mobley has offered no evidence showing that the HMAs' training played any part in the decision to discharge her, so there is no basis upon which to infer that Mobley would not have been discharged if Speer had told them about Wooley's training. Rather, the record shows that Merakey's investigation relied on Mobley's own admissions and corroborating testimony from multiple witnesses, and thus, as in *Jones*, the undisputed evidence excludes the possibility that Merakey merely "adopted [Speer's] biased account of the events." *Id.* Moreover, it is undisputed that Mobley's employment was terminated based on her failure to provide for or ensure that proper care was provided to a Consumer, and that the Certified Investigation Report recommended termination of Mobley's employment because Merakey's standards for patient care were not followed and because Mobley carried a higher level of responsibility for the violations that occurred on April 11, 2019. (Docket Nos. 48, ¶¶ 3, 73, 75, 78, 79, 80; 54, ¶¶ 3, 73, 75, 78, 79, 80).

Because Mobley has failed to proffer evidence showing that Speer's actions (which, according to Mobley, were motivated by Speer's desire to retaliate against her) interfered with Merakey's investigation or influenced the decision by Merakey's senior management to terminate Mobley's employment, and that Speer's conduct was the proximate cause of Mobley's discharge, the Court finds that there is no evidence from which a reasonable jury could find retaliation here based on a cat's paw theory of liability.

### C.   Temporal Proximity and Evidence of Pretext for Retaliatory Animus

In addition to Mobley cat's paw argument based on Speer's actions, Mobley argues that she also has shown a causal connection between her protected activity and her discharge based on temporal proximity and pretext. Although Mobley notes that the proximity in time between

her complaint to Human Resources and her discharge is significant, she concedes that, while such timing constitutes some evidence of a causal relationship, it does not provide conclusive proof of a causal connection in this case.[4]   Mobley argues that she has, therefore, also shown evidence of a causal relationship by asserting that Merakey's stated reason for discharging her (violation of its Standards of Professional Behavior by putting a resident in a dangerous position) was pretext for the real reason for such dismissal (retaliatory animus).  (Docket No. 56 at 10).

The Court notes that, in moving for summary judgment, Merakey argues primarily that Mobley fails to establish a *prima facie* case of retaliation (although Merakey also asserts, *arguendo*, that even if Mobley could establish her *prima facie* case, she still fails to meet her ultimate burden of persuasion to show that Merakey's legitimate nondiscriminatory reason was pretext).  In opposing Merakey's motion, Mobley argues primarily that she has shown pretext at the later stage of the *McDonnell Douglas* burden-shifting analysis, but she does not clearly explain how she has shown a causal connection to make her *prima facie* case.  Instead, Mobley merely states that since she "asserts" pretext – that Merakey "is cloaking its real reason for her dismissal (retaliatory animus) behind a pretext that [she] had put a resident in a dangerous position" – she has made a *prima facie* case "and the employer asserts a 'legitimate business reason.'"  (Docket No. 56 at 10).  However, as the Third Circuit has explained with regard to addressing causation in the context of retaliation claims:

---

[4]     The time period at issue here between Mobley's complaint to Human Resources and her discharge involves a period of nearly one month, which the Court agrees is not "unusually suggestive" of retaliatory motive in order to infer a causal link – particularly since a portion of that time was spent conducting a thorough investigation of her alleged wrongdoing that also occurred during that period.  *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997); *see also Richetti v. Saks Fifth Ave.*, Civ. Action No. 11-256, 2013 WL 3802476, at *6-7 (W.D. Pa. July 18, 2013) (fifteen (15) days between the protected activity and the adverse employment action sufficiently demonstrated temporal proximity, but noting that a gap of several weeks or months will generally require additional evidence to show causation); *Wainberg v. Dietz & Watson, Inc.*, Civ. Action No. 17-2457, 2017 WL 5885840, at *7-8 (E.D. Pa. Nov. 28, 2017) (finding that a period of two (2) days between events was sufficiently close temporal proximity to give rise to an inference of a causal connection).

A plaintiff must address causation at both the prima facie and pretext stages, but the type of causation that must be shown at each point differs. *Farrell* [*v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000)]. To establish causation at the prima facie stage, a plaintiff must introduce evidence about the "scope and nature of conduct and circumstances that could support the inference" of a causal connection between the protected activity and adverse action. *Id.* at 279. At this stage, "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between [the] protected activity and the adverse action taken." *Marra* [*v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)] (quoting *Farrell*, 206 F.3d at 284). For example, very close temporal proximity between the adverse action and the protected activity may be "unusually suggestive" of a causal connection. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (internal quotation marks and citations omitted). A plaintiff can also rely on evidence such as "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.* at 232-33.

By contrast, to prove causation at the pretext stage, the plaintiff must show that she would not have suffered an adverse employment action "but for" her protected activity. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, [570 U.S. 338], 133 S. Ct. 2517, 2533, 186 L. Ed.2d 503 (2013).

*Young v. City of Philadelphia Police Dep't*, 651 F. App'x 90, 95–96 (3d Cir. 2016).

Therefore, in order to analyze Mobley's retaliation claim properly under the *McDonnell Douglas* burden-shifting framework, and to address the argument that Merakey makes in its summary judgment motion – and since the same evidence may be considered at both the p*rima facie* and pretext stages of the analysis[5] – before the Court considers whether Mobley has shown causation at the later pretext stage, the Court will first consider whether Mobley has shown causation at the *prima facie* stage by proffering evidence of retaliatory animus from which a jury could infer a causal connection between her complaint and her discharge.

---

[5]     "Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas–Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the analysis." *Toth v. Cal. Univ. of Pa.*, 844 F. Supp. 2d 611, 637–38 (W.D. Pa. 2012) (citing *Doe v. C.A.R.S. Protection Plus, Inc.,* 527 F.3d 358, 370 (3d Cir. 2008)).

The only reference that Mobley makes to specific evidence in support of causation is near the end of her opposition brief, where she simply states that "in this case there is a large amount of evidence, as cited above, that could lead a reasonable jury to conclude that the so called articulated ligitimate business reason was nothing more than a pretext."  (Docket No. 56 at 11). The Court notes that, upon review of the evidence cited in her brief (other than the evidence regarding Speer withholding information as to Wooley's training, which is discussed at length, *supra*, in the context of cat's paw liability), all such evidence involves various instances in which either Speer made racially insensitive remarks or treated Mobley unfairly, or instances when other Merakey employees committed Consumer-safety-related infractions but were not discharged.  (Docket No. 56 at 1-9).  Thus, although Mobley does not clearly explain *how* the cited evidence shows retaliatory animus linked to her discharge, she appears to argue that she has shown such animus through evidence of antagonistic conduct toward her, and through evidence of other employees' preferential treatment.  *See, e.g., Thompson v. Kellogg's USA*, 619 F. App'x 141, 144-45 (3d Cir. 2015) (in considering evidence of a pattern of antagonism, a court may "generally look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, . . . inconsistent reasons given by the employer for terminating the employee[,] or the employer's treatment of other employees" (internal quotation marks and citation omitted)).

As to the cited instances of Speer making racially insensitive remarks or treating Mobley unfairly, because Speer did not make or significantly influence the decision to terminate Mobley's employment (*see* cat's paw discussion, *supra*), any dispute over her remarks or treatment is not relevant to the Court's analysis of a causal connection here.  *See Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995) (stating that "stray remarks by

non-decision makers . . . are inadequate to support an inference of discrimination by the employer"); *Moussa v. Commw. Of Pa. Dep't of Pub. Welfare*, 289 F. Supp. 2d 639, 658 n.13 (W.D. Pa. 2003) (in which the plaintiff failed to establish that there was evidence that the decision-makers made discriminatory remarks or otherwise harbored discriminatory animus).

As to the cited examples of Merakey's treatment of other employees who committed Consumer safety infractions, the instances of such infractions include:  (1) an HM missed providing medications to a Consumer twice, and his dog bit someone at an SFR; (2) an HMA texted Speer that Ed (at some earlier point in time) had wheeled himself into the kitchen at an SFR, alone and unsupervised, while two other employees were on the porch smoking, but there was no record of a follow-up investigation or discipline; (3) Ed fell in his wheelchair on a bus, and an HR investigation ensued but the HM was not discharged; and (4) an HM gave a Consumer the wrong dosage of medication.  (Docket No. 56).  However, "[g]enerally speaking, a plaintiff claiming 'that he was disciplined by his employer more harshly than a similarly situated employee [a "comparator"] based on some prohibited reason . . . must show that he is similarly situated with respect to performance, qualifications, and conduct,' which 'normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Thompson*, 619 F. App'x at 146 (quoting *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617–18 (7th Cir. 2000)).

While Mobley seemingly contends that other employees made errors that involved the Consumers' safety, but they were not discharged, she has not produced evidence showing that those employees either engaged in misconduct similar to hers (in the first, third, and fourth

instances cited), or had similar disciplinary records (in all four instances cited).  Moreover, Mobley has not shown that those other employees had their discipline determined by the same decision-makers who made the decision to discharge her (in all four instances cited).  In fact, at oral argument, Mobley's counsel was asked whether the incidents cited were reported to, or considered by, the same individuals who ultimately made the decision to terminate Mobley's employment, to which counsel said that they had not been reported up the chain:

> The Court: Is there any evidence in the record that those incidents, or that incident in particular, was reported up to or considered by the same individuals who ultimately made the decision to terminate Ms. Mobley?
>
> Mr. Newborg: No, it never was investigated.
>
> The Court: Okay.
>
> Mr. Newborg: No.
>
> The Court: Never got past Speer.
>
> Mr. Newborg: It never got past Speer . . . .

(Docket No. 60 at 19).  Mr. Newborg then corrected his statement to indicate that the incident involving Ed's fall was investigated by HR, and the Court further asked:

> The Court: In an instance or two that you referenced right from the deposition transcript in which HR was involved in an investigation about it, does the record reflect who those people were that were involved? The names of the people that actually conducted or participated in that particular investigation?
>
> Mr. Newborg: My recollection, Your Honor, and I'm sure defense counsel will correct me if I'm wrong, but I don't remember seeing any documents that referenced any such investigation.

(Docket No. 60 at 20-21).

Since Mobley has failed to identify any similarly situated comparators, the treatment of the other employees that she cites as evidence of retaliatory animus "does nothing to advance

[her] retaliation claim." *Thompson*, 619 F. App'x at 146 (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 269 (3d Cir. 2007) (finding that a plaintiff-student's comparison to other students "did not have evidentiary value on the retaliation issue as they were not similarly situated")).  Mobley has thus failed to show evidence of retaliatory animus here in order to support an inference of a causal connection between her complaint to Human Resources and the termination of her employment.

Accordingly, because Mobley has failed to proffer evidence from which a reasonable jury could infer a causal connection between the protected activity and the adverse action alleged, she has failed to establish a *prima facie* case of retaliation, and judgment as a matter of law in favor of Merakey on Mobley's retaliation claim is appropriate.[6]  Merakey's motion for summary judgment on Mobley's retaliation claim will therefore be granted.

---

[6]       Assuming, *arguendo*, that the Court did find that Mobley established a *prima facie* case of retaliation and that Merakey satisfied its burden to advance a legitimate, non-retaliatory reason for its conduct, then to show that Merakey's proffered reason is pretext, Mobley "'must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 501 (3d Cir.1997)).  In *Fuentes v. Perskie*, the Third Circuit recognized two ways in which a plaintiff can demonstrate that an employer's legitimate, nondiscriminatory reason is pretextual.  *See* 32 F.3d 759 (3d Cir. 1994).  First, a plaintiff can adduce evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action.  *See id.* at 764-65.  To establish such disbelief, the evidence "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765.  Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons "that a reasonable factfinder *could* rationally find them unworthy of credence," and thus infer that the employer did not, in fact, act for the legitimate, nondiscriminatory reasons that have been articulated.  *Id.* (emphasis in original) (internal citations and quotation marks omitted).  Second a plaintiff can present "sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (*e.g.,* by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons)." *Id.*

       Upon consideration of Mobley's proffered evidence of causation at the later pretext stage as well, for the same reasons as discussed, *supra*, at the *prima facie* stage, the Court finds that Mobley has not shown, under *Fuentes*, evidence upon which a reasonable jury could disbelieve Merakey's stated legitimate reason for Mobley's discharge, nor has Mobley shown evidence from which a reasonable jury could infer that retaliatory animus was the but-for cause of Mobley's discharge.  *See Young*, 651 F. App'x at 96-97 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. at 360).  Mobley has proffered no evidence demonstrating weaknesses or contradictions in Merakey's stated reason for discharging Mobley.  Also, as explained at length, *supra*, the evidence of Speer's

IV.     **<u>CONCLUSION</u>**

Based on the foregoing, Merakey's Motion for Summary Judgment is granted. Accordingly, summary judgment is granted in favor of Merakey as to all claims in the Complaint.

An Order consistent with this Memorandum Opinion follows.


Dated: November 9, 2023                              *<u>s/ W. Scott Hardy</u>*
                                                     W. Scott Hardy
                                                     United States District Judge

cc/ecf: All counsel of record

---

racially insensitive remarks or unfair treatment does not show pretext since Speer did not interfere with the investigation or influence the decision to discharge Mobley.  Furthermore, the evidence of instances of Merakey's treatment of other employees, who also committed infractions related to Consumer safety, did not involve similarly situated employees who engaged in misconduct similar to hers, had similar disciplinary records, and had their discipline determined by the same decisionmakers who decided to discharge Mobley.